753 S.E.2d 761

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Brandon FLACK, Defendant Below, Petitioner.**

No. 12–0829.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 24, 2013.

Decided Nov. 26, 2013.

Derrick W. Lefler, Esq., Gibson, Lefler & Associates, Princeton, WV, E. Ward Morgan, Esq., Bluefield, WV, for Petitioner.

Patrick Morrisey, Attorney General, Laura Young, Esq., Assistant Attorney General, for Respondent.

Justice KETCHUM:

The defendant, Brandon Flack, appeals his convictions for the offenses of first degree murder, first degree robbery and criminal conspiracy. Upon thorough review of the record and consideration of the parties' briefs and arguments, we find no reversible error and affirm the defendant's convictions.

## I. Factual Background

In late January 2011, the defendant and three other men devised a plan to burglarize the home of the defendant's uncle. On the evening of the planned burglary the four men gathered ski masks and two handguns, and then drove from their homes in Pulaski, Virginia, to Bluefield, West Virginia, where the uncle's house was located. Arriving shortly after midnight on January 29, 2011, the defendant and two of his accomplices donned the ski masks, obscuring their faces, and approached the back of the house. The fourth man remained in the car. Observing that lights were on in the house, one of the men knocked on the back door.

Inside the house were three seventeen-year-old boys, including Matthew Flack, a second cousin of the defendant's. Hearing the knock on the back door, Matthew peered through a curtain. Seeing the three masked men standing at the back door, Matthew ran to the second floor of the house where he retrieved a handgun.

As Matthew ran up the stairs, the defendant kicked in the back door. The three men then entered the house. The defendant went up the stairs and began struggling with Matthew. As Matthew and the defendant struggled, Jasman Montogmery, who was one of the defendant's accomplices, ran up the stairs, pulled out a pistol and shot Matthew in the face.

Although mortally wounded, Matthew shot and wounded the defendant. As Matthew lay on the floor dying, the defendant and his two

accomplices ran out of the house and fled from the scene.

The three men took the defendant, who was bleeding heavily, to the Bluefield Regional Medical Center. In an effort to explain the shooting, the men concocted a story that the defendant had been shot in a drive-by-shooting. As the defendant received treatment, the men returned to the car where they waited in the parking lot. Police officers arrived at the hospital to investigate and went to the parking lot to talk with the three men. Noticing blood on the inside and outside of the car, the officers asked for and were given permission to search the vehicle. The officers found two handguns and ski masks in the car.

The defendant was indicted for first degree murder, burglary, first degree robbery and conspiracy to commit first degree murder. The defendant pled not guilty and his case proceeded to trial. During jury selection defense counsel objected to the venire, and to the jury pool as a whole. Noting that the defendant is African American, defense counsel argued that both the jury pool and the venire were "absolutely devoid of any African–American participants."[1] The State responded[2] by noting that the jury pool was based on Department of Motor Vehicle and voter registration records, and that it was "completely race neutral." The trial court overruled the objection, finding that the pool was randomly drawn and selected, and that there was no evidence of any intentional discrimination in how the jury pool was drawn.

At trial, the State's witnesses included Jasman Montgomery (the accomplice who shot and killed Matthew Flack) and Dr. James Kaplan, the State Medical Examiner.

Montgomery pled guilty to first degree murder and received a life sentence with the possibility of parole after serving fifteen years. As part of his plea agreement, Montgomery testified for the State and testified about his guilty plea before the jury. Further, he discussed the planning of the robbery, the forced entry into the Flack residence, his shooting of Matthew Flack, and testified about driving the defendant to the hospital. At no time during the trial did defense counsel request that the jury be given a limiting or cautionary instruction regarding the consideration which the jurors could—or could not—give to Montgomery's testimony that he had pled guilty to murdering Mr. Flack.

Dr. James Kaplan, who did not conduct the autopsy of Matthew Flack, testified that Mr. Flack died as a result of a gunshot wound. The autopsy report was not introduced into evidence, and the pathologist who prepared the report did not testify. Defense counsel did not object to Dr. Kaplan's testimony.

The jury found the defendant guilty of all charges set forth in the indictment. The defendant then moved for a new trial. The defendant's motion argued that his rights were violated when the trial court failed to *sua sponte* give the jury a limiting instruction regarding Montgomery's testimony about his guilty plea. The defendant also argued that his constitutional rights were violated because the jury panel lacked African–American members.[3]

On June 7, 2012, the trial court denied the motion for a new trial. The trial court found that the defendant failed to object to Montgomery's testimony about his guilty plea, and concluded that Montgomery's testimony was more helpful to the defendant than prejudicial. It was more helpful, the trial court reasoned, because Montgomery admitted that he personally shot and killed Matthew Flack, and even testified that the defendant

1. Defense counsel did not note that one African American was stricken from the jury pool for cause when the prospective juror disclosed that she was related to the defendant.

2. In its Response Brief the State argues that the defendant failed to raise the racial issue during jury selection, and that the defendant "has not offered an explanation regarding his failure to raise any sort of 'racial' challenge to the jury selection process at the time his jury was select-

ed." A close reading of the trial transcript shows that defense counsel did raise the issue during jury selection.

3. The motion for new trial set forth additional grounds upon which the defendant believed a new trial should be awarded. However, these additional grounds have not been raised as an assignment of error in this appeal and we need not discuss them.

did not have a handgun and that the defendant had admonished Montgomery for having a handgun. The trial court further found that plain error was not triggered because an

> analysis of every witnesses' trial testimonies reveals no unfairness and certainly no doubt that the jury's verdict was proper and was NOT disproportionately affected by Mr. Montgomery's testimony. The evidence was sufficient and substantial to convict the defendant.

(Emphasis in original).

Further, the trial court found that the defendant failed to present any evidence that African Americans were "systematically excluded" from jury selection in Mercer County. The trial court noted that Mercer County "employs a state-wide system that draws names for jury duty in a racially neutral manner" which is that the pool is gathered from random drawings of voter and Department of Motor Vehicle records.

The trial court later dismissed the burglary offense after finding that it was a lesser included offense of the felony murder charge (*i.e.*, it was the predicate felony). The defendant was sentenced to life imprisonment with eligibility for parole after fifteen years for the murder offense, a determinate term of forty years for the first degree robbery offense, and an indeterminate term of one to five years on the conspiracy offense. The trial court ordered all sentences to run consecutively. The defendant now appeals.

## II. Standard of Review

The defendant presents four assignments of error in his appeal: (1) that the failure to give a limiting instruction regarding Montgomery's testimony about his guilty plea constitutes reversible error; (2) that his jury was not drawn from a fair cross section of the community; (3) that Mercer County does not comply with the statutory requirements counties are required to follow when assembling a jury pool; and (4) that Dr. Kaplan's testimony violated his confrontation rights. While these assignments of error are subject to particular standards of review set forth in our discussion, *infra*, we observe that there are also general standards guiding our review of the findings and rulings of a trial court.

In *State v. White*, 228 W.Va. 530, 536, 722 S.E.2d 566, 573 (2011), we observed that

> " '[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976)." Syllabus point 1, *Andrews v. Reynolds Memorial Hospital, Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997).

This Court has also noted that

> [i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syllabus Point 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

We now turn to the issues presented in this appeal.

## III. Discussion

1. *Failure to give a limiting instruction.*

The defendant did not request a limiting instruction at the time of Montgomery's testimony, or during the trial court's jury instruction conference. It was not until *after* the trial that defense counsel raised the argument that a trial court must, *sua sponte*, give a limiting instruction when an accomplice has pled guilty and, at the later trial of the defendant, testifies on behalf of the State and relates that guilty plea to the jury. While the defendant did not object or request a limiting instruction, he nonetheless argues that the issue is plain error requiring that we reverse his convictions and remand his case for a new trial. *See State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995) ("To

trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.").

■ In Syllabus Point 3 of *State v. Caudill*, 170 W.Va. 74, 289 S.E.2d 748 (1982), we held that

[i]n a criminal trial an accomplice may testify as a witness on behalf of the State to having entered a plea of guilty to the crime charged against a defendant where such testimony is not for the purpose of proving the guilt of the defendant and is relevant to the issue of the witness-accomplice's credibility. *The failure by a trial judge to give a jury instruction so limiting such testimony is, however, reversible error.*

(Emphasis added). The defendant argues that *Caudill* requires a trial court to, *sua sponte*, give a limiting instruction when an accomplice who has pled guilty testifies to that guilty plea at another defendant's trial.[4] The State responds that to impose such a duty upon the trial court may, in actuality, interfere with a defense strategy on dealing with the accomplice's testimony. The State posits that defense counsel, faced with the difficult task of dealing with the damaging testimony of an accomplice, may not want to have a *Caudill* instruction because such an instruction could emphasize the damaging testimony. In such cases the trial court could be interfering with a defendant's right to develop his own trial strategy.[5] We agree.

*Caudill* does not directly address the issue presently before this Court: whether it is reversible error in all instances where a trial court fails to give a *Caudill* limiting instruction or whether it is reversible error only where the trial court has failed to give the limiting instruction when it has been requested by the defendant. We believe the proper answer to be the latter of these two possibilities. Since this is a relatively novel issue for this Court, we have considered decisions of courts in other jurisdictions where a similar issue was resolved.

In *United States v. DeLucca*, 630 F.2d 294, 299 (5th Cir.1980) (footnotes omitted), the Court of Appeals observed that

[o]rdinarily, when the jury learns of a co-defendant's guilt for the same or similar offenses, and the defense counsel does not request that a curative instruction be given, the failure of the trial judge to give one will not require reversal. *United States v. Beasley*, 519 F.2d [233] at 240 [ (5th Cir. 1975) ]. Only in those rare situations in which other "aggravating circumstances" have exacerbated the prejudice will the failure to give cautionary instructions result in plain and reversible error. *See e.g., United States v. Harrell*, 436 F.2d 606, 617 (5th Cir.1970) (court's conclusion of plain error was specifically predicated upon both aggravating circumstances and the absence of any cautionary instructions, as well as the lack of defense objections).

*See also United States v. Ojukwa*, 712 F.2d 1192, 1193–94 (7th Cir.1983) (rejecting a defendant's argument that reversible error occurred because the trial court failed to give a limiting instruction, observing that "when

---

4. In *Caudill*, 170 W.Va. at 82, 289 S.E.2d at 756, we noted with approval the following two examples of limiting instructions:

[Example 1] I want to tell you again the fact that such pleas were entered does not mean that the remaining three defendants on trial ... are guilty with them. The pleas are not evidence to the defendants remaining on trial that they are guilty, or the crime charged in the indictment was committed.

[Example 2] These pleas do not give rise to any inference as to the guilt of the remaining defendants here on trial. The guilt or innocence of the defendants still on trial must be determined solely by you, solely by the evidence introduced in the trial of this case.

5. Some legal writers have observed that a defendant may not wish to have a limiting instruction. For example, one writer opined that

[r]esearch shows that the typical limiting instruction has little chance of being understood by a jury. [Defendants] may actually be better off waiving the limiting instruction than highlighting something that hurts. Research shows that the jurors are more prone to listen to the inadmissible evidence after they have been told to disregard it.

Jill S. Gelineau, *Legal Instructions for a Jury or Commission in a Condemnation Case*, SJ051 ALI–ABA 169 (2003).

'defense counsel does not request that a curative instruction be given, the failure of the trial judge to give one will not require reversal.'"); *State v. Ross,* 951 P.2d 236, 239 (Utah Ct.App.1997) (addressing the issue of whether it was plain error for a trial court to fail to give a limiting instruction under similar factual circumstances, and observing that a "majority of circuits have similarly refused to find plain error in a court's failure to issue a sua sponte cautionary instruction.").

In *United States v. Davis,* 838 F.2d 909 (7th Cir.1988), the Court of Appeals observed that a "district court should normally instruct the jury that the evidence [of the accomplice's guilty plea or conviction] may only be used for limited purposes and may not be used as substantive evidence of another's guilt," but that "failing to give a curative instruction does not ordinarily constitute plain error." *Davis,* 838 F.2d at 917. The Court also observed that a defendant not making an issue of the accomplice's testimony will "usually waive the issue for purposes of appeal" and that "[p]lain error will 'only be found in those rare instances in which other "aggravating circumstances" have exacerbated the prejudice.'" *Id.* (citations omitted).

 We find the reasoning set forth by the cases in our review to be persuasive. Defense counsel may have ample reason to get beyond an accomplice's damaging testimony as quickly as possible. Whether the trial court should instruct the jury how the accomplice's testimony could, or could not, be considered is a matter best left to the discretion of defense counsel. Accordingly, for the reasons discussed, we hold that an accomplice who has entered a plea of guilty to the same crime charged against the defendant may testify as a witness on behalf of the State. However, if the jury learns of the accomplice's guilty plea, then upon the motion of the defendant, the trial court must instruct the jury that the accomplice's plea of guilty cannot be considered as proving the guilt of the defendant, and may only be considered for proper evidentiary purposes such as to impeach trial testimony or to reflect on a witness' credibility. The failure of the trial court, upon request, to give such a limiting jury instruction is reversible error.

To the extent that Syllabus Point 3 of *State v. Caudill,* 170 W.Va. 74, 289 S.E.2d 748 (1982) is inconsistent, it is hereby modified.

When the defendant's accomplice Montgomery testified that he had pleaded guilty to the murder of Matthew Flack, the defendant did not preserve any error by objecting or requesting a limiting instruction. We also cannot say that plain error doctrine has been triggered. There was no evidence that the prosecutor sought to infer the defendant's guilt by virtue of Montgomery's guilty plea, nor was there evidence of any aggravating circumstances surrounding Montgomery's testimony. Accordingly, we do not find that the "trial court has acted under some misapprehension of the law or the evidence," *State v. White,* 228 W.Va. at 536, 722 S.E.2d at 573, in denying the defendant's motion for a new trial on the ground that it failed to give a limiting instruction regarding Montgomery's testimony.

### 2. *Jury Issues.*

The defendant's second and third assignments of error are related, and we consolidate them for purposes of our discussion. The defendant contends that his right to be tried by a jury drawn from a cross-section of his community was violated because there was an insufficient number of African Americans in his jury pool and venire. The defendant asserts that, based on the 2010 Census, the African–American population in Mercer County was 6.1 percent. In contrast to that percentage, the defendant noted that only one person in his jury pool was African American and that she was released after disclosing that she was related to the defendant.

 In Syllabus Point 2 of *State v. Hobbs,* 168 W.Va. 13, 282 S.E.2d 258 (1981), we held that in order for a defendant

[t]o establish a prima facie case of unconstitutional jury selection methods under the Sixth Amendment's fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the

number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

■ Reviewing this standard, the first element is clearly established from the record. The defendant is African American and he is alleging that members of his race were systematically excluded from jury service. However, there is *no evidence* in the record to support any findings regarding the second or third elements. Most important, there is no evidence that any under-representation was due to systematic exclusion of African Americans in the jury selection process.

We see nothing in the record that would lead this Court to conclude that the jury selection process in Mercer County is constitutionally or statutorily flawed. The defendant has failed to meet his burden to present proof sufficient to meet the second and third elements set forth in Syllabus Point 2 of *Hobbs*. Accordingly, we find no merit in the assigned errors.

### 3. *Confrontation Issue.*

The defendant's final assignment of error is that the trial court violated the defendant's constitutional right to confrontation by permitting Dr. Kaplan to testify about Matthew Flack's cause of death, when he had not conducted the victim's autopsy. Counsel for the defendant did not object to Dr. Kaplan's testimony at the time he was called to testify, and did not seek to prevent his testimony. Moreover, the defendant does not request that we review this issue as plain error in his brief. However, because confrontation issues involve a fundamental constitutional right of a defendant, we will review the issue under our plain error doctrine. *See* Syllabus Point 4, *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975) ("Although it is a well-settled policy that the Supreme Court of Appeals normally will not rule upon unassigned or imperfectly assigned errors, this Court will take cognizance of plain error involving a fundamental right of an accused which is protected by the Constitution.").

■ This Court has consistently held that a trial court's rulings on the admissibility of evidence, "including those affecting constitutional rights, are reviewed under an abuse of discretion standard." *State v. Marple*, 197 W.Va. 47, 51, 475 S.E.2d 47, 51 (1996). In Syllabus Point 1 of *State v. Shrewsbury*, 213 W.Va. 327, 582 S.E.2d 774 (2003), we explained that "[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *Accord* Syllabus Point 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998) ("A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.").

The Confrontation Clause of the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* guarantee the right of a criminal defendant to confront and cross-examine witnesses against him. In *State v. Frazier*, 229 W.Va. 724, 735 S.E.2d 727 (2012), we held that a defendant's confrontation rights were violated when the State Medical Examiner was permitted to testify as to the contents of an autopsy report prepared by an associate pathologist.[6] We found that "it was error for the trial court to admit into evidence the autopsy report and to permit [the State Medical Examiner] to testify as a surrogate witness." *Id.* at 729, 735 S.E.2d at 732. See also *State v. Kennedy*, 229 W.Va. 756, 735 S.E.2d 905 (2012) (Confrontation Clause violated where Medical Examiner permitted to testify as to surrogate's autopsy findings); Syllabus Point 6, *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006) ("Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 [2004], the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bar the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify

**6.** The surrogate pathologist had performed the actual autopsy and Dr. Kaplan merely signed off on the final report as a statutorily required function associated with reports being issued in the name of the Chief Medical Examiner.

and the accused had a prior opportunity to cross-examine the witness."); *but see State v. Blevins,* 231 W.Va. 135, 158, 744 S.E.2d 245, 268 (2013) (per curiam) (medical examiner's testimony regarding another pathologist's report was harmless error; State proved beyond a reasonable doubt that the disclosure of the information contained in autopsy reports prepared by one pathologist through the testimony of the medical examiner did not contribute to defendant's conviction or punishment.).

We made clear in Syllabus Point 3 of *Frazier* that "[i]n a criminal case, the burden is upon the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." In the case before us the autopsy report was not admitted into evidence. However, Dr. Kaplan did testify as to its contents and findings.

After review of the entire record we conclude that the error raised by the defendant was harmless beyond a reasonable doubt. Unlike the facts we addressed in *Frazier,* where the manner of death was very much in contention, Dr. Kaplan's testimony at the defendant's trial had little probative value and mirrored testimony from other witnesses. Montgomery testified and *admitted to shooting Matthew Flack.* The defendant did not contest Montgomery's testimony that he was the shooter. Dr. Kaplan merely confirmed that Matthew Flack died as a result of a gunshot wound, and that the death was a homicide. Of critical import is that nothing in Dr. Kaplan's testimony implicated the defendant in the homicide, linked him to the crimes charged, or made it more likely or less likely that the defendant committed the murder of Matthew Flack. *See Blevins, supra.*

Accordingly, we find the error raised to be harmless beyond a reasonable doubt. Syllabus Point 3, *Frazier, supra.*

### IV. Conclusion

For the reasons set forth herein, the defendant's convictions and sentences are affirmed.

Affirmed.